UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ESTEBAN QUNITERO AND LETICIA QUINTERO,**<br><br>       Plaintiffs,<br><br>   v.<br><br>**UNITED STATES OF AMERICA,**<br><br>       Defendant. | 1:08-cv-01890-OWW-SMS<br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING BENCH TRIAL |

## I.   INTRODUCTION.

Plaintiffs Esteban Quintero ("Esteban") and Leticia Quintero ("Leticia") are proceeding with an action against the United States of America pursuant to the Federal Tort Claims Act.  28 U.S.C. § 2671, *et seq*.

On April 29, 2010, the court concluded a three-day bench trial and ordered counsel to submit proposed findings of fact conclusions of law.  Esteban submitted proposed findings on May 7, 2010. (Docs. 47, 48).  Leticia submitted proposed findings on May 10, 2010.  (Docs. 49, 50).  The United States submitted proposed findings on May 10, 2010. (Doc. 51).

## II. FINDINGS OF FACT

1.  Prior to May 12, 2006, Esteban was a healthy 44 year-old man

**1**

with no physical disabilities, and Leticia was a healthy 46 year-old women with no physical disabilities.

2.  On May 12, 2006, Esteban was driving his 2002 Yamaha Roadster motorcycle north bound on Santa Fe Road in Merced County. Leticia was a passenger on the motorcycle.  Plaintiffs' motorcycle was designed and configured for cruising and was equipped with an after market wind screen, saddlebags, two seats, and upright handlebars.  The motorcycle was in operative condition and had a braking system that included a foot brake and a hand brake.  The hand brake was on the left handle bar and was activated by pressure.

3. Plaintiffs traveled to the Chukchansi Casino approximately two hours from their residence, which is at 7186 Monterey Court in Winton, California, where Esteban Quintero has resided for approximately 30 years and Leticia Quintero has resided approximately 28 years by inference, as they have been married 28 years.

4. The time of the incident, according to the testimony of the Highway Patrol officer who investigated, was approximately 2:05 p.m. That accident report, in evidence as Exhibit 51, shows that the officer, John Patterson, an experienced Highway patrolman, arrived at approximately 2:30 to 2:35 p.m.
///
///

5. Plaintiffs were traveling at approximately 55 to 60 miles per hour in a 55 miles per hour zone.

6. No evidence of comparative fault was offered.

7. As Plaintiffs approached the intersection of Santa Fe Road and Buchanan Hollow Road, Esteban Quintero saw a Unites States' postal service delivery truck stopped at a stop sign on Buchanan Hollow Road facing east.  The weather conditions were clear, it was a sunny day, the payment was dry, there were no obstructions to vision either forward or backward.

8. The postal truck was then driven by Valerie Babb, whose married name at the time of trial was Valerie Kuwatani.  Ms. Babb was a relief driver filling in for the regular route driver who was not on duty May 12.

9. As Plaintiffs approached the intersection of Santa Fe Road and Buchanan Hollow road, the postal truck left the stop sign and turned into the north-bound lane of Santa Fe Road.  Ms. Babb did not see Plaintiffs' motorcycle as she negotiated the turn on to Santa Fe Road.  Plaintiffs were wearing dark clothing, which provided at least some basis for them and their motorcycle to bee seen as they approached the intersection, and the motorcycle was in close enough proximity to Ms. Babb's position that it would have been clearly visible.

10.  Esteban Quintero unsuccessfully attempted to avoid a

**3**

collision with the postal truck by applying his brakes and steering the motorcycle off to the right. Plaintiffs' motorcycle struck the postal truck, knocking Esteban and his motorcycle to the ground and ejecting Leticia from the vehicle.

11. Plaintiffs were taken by ambulance to Mercy Medical Center in Merced immediately following the accident. Leticia was released from Mercy Medical Center after a physical examination and X-rays. Esteban was transferred to Memorial Hospital in Modesto, and then to Doctors Medical Center in Modesto. Esteban was hospitalized for injuries sustained in the collision with the postal truck from May 12, 2006 to May 30, 2006.

**Esteban's Injuries and Treatments**

12. Esteban's primary injuries were to his left leg: a segmental tibia fracture with interarticular tibial plateau fracture component and fractures of the tibia and fibula both proximally and distally. Esteban also suffered road burns to his upper extremities, a decubitus ulcer wound on his left heel, and multiple necrotic blisters on his left calf.

13. On May 24, 2006, Dr. Robert Cash, an orthopedic surgeon, performed surgery to repair Esteban's lower leg fractures. These procedures, described as open reduction and internal fixation of left tibial plateau fracture and external fixation of the distal tibia fibula fracture, involved approximately ninety minutes of surgical time.

**4**

14.  Esteban received treatment for soft tissue injuries at Valley Wound Healing Center in Modesto approximately three times per week from June 19, 2006 through December 11, 2006.

15.  Esteban underwent surgery at Stanislaus Surgical Hospital to remove the external fixator and to perform debridement of the decubitus ulcer on his heel on August 21, 2006.

16.  On November 29, 2006, Dr. Cash performed arthroscopic surgery upon Esteban in order to repair damage to the meniscus and cartilage in Esteban's left knee at Stanislaus Surgical Hospital.  The procedure was described as arthroscopy with chondroplasty of the patella and lateral partial meniscectomy.

17. On December 29, 2006, Dr. Cash authorized Esteban to return to full work duties as a restaurant manager on January 8, 2007.

18. On December 10, 2007, Esteban returned to Dr. Cash's office with a primary complaint of pain along the plantar surface of the left foot. He was referred to physical therapy to assist with stretching of the Achilles tendon, foot and ankle.

19. On December 8, 2008, Esteban returned to Dr. Cash with complaints of intermittent heel pain, a stiff ankle, and knee pain. Radiographs of the ankle revealed atrophy changes of the bone and some mild arthritic changes.

20. On March 19, 2009, Dr. Cash performed surgery on Esteban at

**5**

Stanislaus Surgical Hospital to remove bone spur from the left ankle. Dr. Cash also injected a corticosteroid into Esteban's left knee.

21. On January 26, 2010, radiographs of Esteban's left lower extremity were performed at Turlock Imaging Services. The radiographs revealed mild osteoarthritis of the ankle joint; mild osteopenia of the ankle; mild osteophytic spurring of the ankle; and mild osteoarthritis of the knee. Earlier imaging showed more severe osteopenia of the left lower extremity; the fact that Mr. Quintero's bone density has improved in the left lower extremity is evidence of his increased ability to bear weight on his left leg.

22.  On February 8, 2010, Dr. Cash again examined Esteban's left knee and ankle due to Esteban's complaints of pain and stiffness. Dr. Cash administered a corticosteroid injection to the Esteban's left knee on February 22, 2010.

23.  The billed charge for Esteban's hospitalization at Doctors Medical Center from May 15, 2006 to May 30, 2006, was $214,013.97.  Esteban and his insurer paid $27,492.61 for such medical services.

24. Dr. Cash's billed charge for performing the ninety-minute surgery to repair Esteban's tibia and fibula fractures on May 24, 2006, was $5,460.00. The total amount paid by Esteban's insurer for such medical services was $1,527.35.

**6**

25. Dr. Cash's billed charge for performing surgery upon Esteban on March 19, 2009, to remove the bone spur from his ankle and to inject a corticosteroid into the knee, was $5,300.00. The total amount paid by Esteban's insurer for such medical services was $589.54.

26. The billed charge by Stanislaus Surgical Hospital for Esteban's bone-spur surgery on March 19, 2009, was $17,947.00. The total amount paid by Esteban and his insurer for such medical services was $4,493.34.

27. The total amounts paid by Esteban and his insurers for all medical care from the date of the accident, including the initial hospitalization and surgical repair of fractures, wound care, the later surgery to remove the external fixator, knee arthoscopy, bone spur surgery, physical therapy, medications and various attendant expenses is $74, 864.83. (JX 8.1-8.6).

28. As a result of injuries sustained in the May 12, 2006 accident, Esteban missed work from May 12, 2006, until January 8, 2007.

29. Esteban's bi-weekly salary from January 2005 to August 2005 was $1,250.00. (JX 9). In September 2005, Esteban's bi-weekly salary increased to $1,500.00. (JX 9). In addition to his base salary, Esteban received monthly bonus payments ranging from zero to approximately $5,000.00 per month depending on the success of

**7**

the business.  The average monthly bonus payment Esteban received in the years 2005, 2006, and 2007 was $2,024.49.

30.  Esteban received one paycheck in May 2006 for $1,500.00 and a bonus payment of $5,066.37.  (JX 9).  Esteban did not receive any more paychecks until he received a $791.20 salary payment on January 14, 2006.  (JX 9).

31.  Esteban did not receive his regular salary payment of $1,500.00 for second half of May 2006 due to his hospitalization after the accident.  Esteban was unable to work during the months of June, July, August, September, October, November, and December of 2006, and thus lost seven months worth of $3,000 in monthly salary.  Esteban missed the first week of work in January 2007 and thus received only $2,291.20 that month, $708.80 less than he would have received had he worked the entire month.  In total, Esteban lost $23,208.80 in regular salary from 2006 to 2007 based on time he was unable to work as a result of the accident.

32.  In addition to lost salary payments, Esteban also lost seven monthly bonus payments in 2006 worth an average of $2,024.49, for a total bonus loss of $14,171.43.

33.  Esteban missed an additional two weeks of work in March 2009, presumably costing him half a month's salary, or $1,500.00. No evidence suggests that Esteban did not receive his monthly bonus payment in January of 2009.

**8**

34. Esteban's lost earnings resulting from the accident total $38,880.23. This total is over $11,000 more than the number Plaintiffs advance. However, Plaintiffs' math makes absolutely no sense. Plaintiffs calculated Esteban averaged $5,200 earnings per month, but then concluded that he lost only $27,300 in wages for the 7.5 months he was unable to work. Defendant contends that Plaintiff's average monthly during the relevant period were $4,500.00 per month, however, Defendant provides no explanation for how this figure was calculated.

35. The primary medical concern for Mr. Quintero's future relates to arthritic changes to the knee and ankle joints. Mr. Quintero has a few millimeters of offset in the knee joint, which has potential consequences for future arthritis. Mr. Quintero's tibia is also three to five percent out of normal alignment due to healing of the fracture, although his anatomic/mechanical axis, which is most important, is maintained.

36. Arthritis in Esteban's left knee caused by the May 12, 2006 motorcycle accident will cause deterioration in the function of Estban's knee and will cause increasing pain as time passes. It is reasonably certain that within the next five to ten years, Esteban will require a surgical knee replacement.

37. Knee replacement surgery is an inpatient procedure that typically involves two to four days in the hospital. According to Dr. Cash, the typical billed charges for knee replacement surgery are as follows: Surgical fee, $4,000-$5,000; hospital

9

fee, $50,000-$80,000; anesthesiologist, $500-$1,000; post-surgical expenses, $2,000-$3,000; physical therapy, $2,400-$3,000. The total billed cost of knee replacement surgery, according to Dr. Cash, is approximately $60,000 to $90,000.  The reasonable estimate for this future surgery is the midrange $75,000.

38. Esteban has traumatic arthritis in his left ankle resulting from the accident.  Over time, the condition of and pain caused by Esteban's ankle will deteriorate to the point that Esteban will require fusing of the ankle joint, causing permanent loss of mobility in the ankle joint.

39.  According to Dr. Cash's estimate, the total billed charges for ankle fusion surgery are approximately $45,000 to $50,000 dollars.  The reasonable estimate for this future surgery is the midrange, $47,500

40. Esteban's current symptoms include pain and stiffness in the ankle and pain and weakness in the knee.  Esteban experiences pain on a daily basis; he describes his ankle pain as ranging between three and ten on a ten-point scale, and his knee pain as ranging between two and ten.  Esteban will experience increasing levels of pain over time until the pain becomes intolerable, requiring surgery.  Esteban walks with a limp and suffers from swelling in his left leg.

41.  The recreational activities that Esteban enjoyed

**10**

before the May 2006 accident included motorcycle riding, fishing and camping. Due to his injuries, Esteban no longer rides a motorcycle and is substantially limited in his ability to enjoy fishing, camping, dancing, and hiking. Esteban continues to be able to do maintenance and repairs around the home but does not undertake certain projects such as laying tile.

42. The primary medical concern for Mr. Quintero's future relates to arthritic changes to the knee and ankle joints. Mr. Quintero has a few milimeters of offset in the knee joint, which has potential consequences for future arthritis. Mr. Quintero's tibia is also three to five percent out of normal alignment due to healing of the fracture, although his anatomic/mechanical axis, which is most important, is maintained.

43. Arthritis in Esteban's left knee caused by the May 12, 2006 motorcycle accident will cause deterioration in the function of Estban's knee and will cause increasing pain as time passes. It is reasonably certain that within the next five to ten years, Esteban will require a surgical knee replacement.

**Leticia Quintero**

44. Immediately after the accident, Leticia was transported by ambulance to Mercy Medical Center with primary complaints of left shoulder and ankle pain.

45. Leticia reported having fallen off the motorcycle and landing on her ankle and shoulder. Her knees were tender but

**11**

without abrasions. Her ankle was swollen but without abrasion, contusion, or ecchymosis. X-rays revealed no fractures of her ankles or knees, but a "small avulsion fracture" was seen on her left shoulder. She was put in a splint, prescribed pain medication, and released the same day with instruction to follow up with her primary care doctor.

46.  Leticia was referred to Richard W. Slovek, M.D., who first examined her on May 17, 2006. His diagnosis was a greater tuberosity fracture of the left shoulder, contusion of the left shoulder, left knee sprain and abrasion, and left ankle sprain. Dr. Slovek prescribed pain medication and a sling for the shoulder and a "Walker Boot" and cane for the ankle.

47.  By July 14, 2006, Leticia Quintero reported to Dr. Slovek that her pain was decreased, shoulder function was a little better, and strength was unchanged. Her ankle stability and function was improved, and she reported only minimal discomfort in the ankle. Range of motion in the ankle was almost normal.  Dr. Slovek advised her to begin physical therapy.

48.  Leticia Quintero completed her twelve sessions of physical therapy on August 30, 2006, and has received no treatment of any kind for these injuries since August 30, 2006.

49.  Occasionally, Leticia continues to experience pain and popping in her shoulder and stiffness in her ankle.

**12**

**III. CONCLUSIONS OF LAW**

**Liability**

1. Under the Federal Tort Claims Act, the liability of the United States is determined in the same manner as if the United States were a private individual under the law of the state where the incident occurred. *see, e.g., Anderson v. United States*, 55 F.3d 1379, 1381 (9th Cir. 1995) (citing *Rayonier v. United States*, 352 U.S. 315, 319 (1957)); 28 U.S.C. §§ 1346(b)(1), 2674. Plaintiffs' claims are governed by California law. *See id.*

2. California Civil Code section 3281 provides: "Every person who suffers detriment from the unlawful act or omission of another, may recover from the person in fault a compensation therefor in money, which is called damages." CAL. CIV. CODE § 3281.

3. California Civil Code section § 3333 provides: "For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not." CAL. CIV. CODE § 3333 (2009). California law defines "detriment" as "a loss suffered in person or property." CAL. CIV. CODE § 3282 (2009).

4. "There is no requirement that a plaintiff prove with certainty the extent of the harm he has suffered as a result of the defendant's conduct," rather, damages must be proven to a

**13**

reasonable certainty. *E.g. Clemente v. Cal.*, 40 Cal. 3d 202, 219 (Cal. 1985); *accord Garcia v. Duro Dyne Corp.*, 156 Cal. App. 4th 92, 99-100 (Cal. Ct. App. 2007).

5.  As the driver of a vehicle on a California road, Ms. Babb owed Plaintiff a duty not to enter the intersection until she could proceed with reasonable safety. *See* CAL. VEH. CODE § 21803. Ms. Babb breached her duty by being inattentive and failing to observe Plaintiffs' motorcycle.  Ms. Babb's inattentiveness or a failure to perceive accurately Plaintiffs' approaching vehicle is both the legal cause and the proximate cause of the accident.

6.  Babb was negligent.

7.  The liability of the United States is established based on the fact that Ms. Babb, an authorized employee acting in the course and scope of her public employment for the postal service, was the proximate cause of the collision which resulted in property damages and personal injuries to Plaintiffs.

8.  There is no basis for imputing negligence or finding any actual negligence on the part of Plaintiffs.  They were not comparatively at fault.

**Economic Damages**

9.  "The normal measure of [medical] damages for a person injured by another's tortious conduct is the reasonable value of medical

**14**

care and services reasonably required and attributable to the tort." *Katiuzhinsky v. Perry*, 152 Cal. App. 4th 1288, 1294 (Cal. Ct. App. 2007) (citing *Hanif v. Hous. Auth.*, 200 Cal. App. 3d 635, 639 (Cal. Ct. App. 1988); *accord* CAL. CIV. CODE § 3359 (2009) ("damages must, in all cases, be reasonable"); *see also Gimbel v. Laramie,* 181 Cal. App. 2d 77, 81-82 (Cal. Ct. App. 1960) ("If the court by reason of evidence adduced during the trial doubted the necessity or reasonableness of any part of the total hospital bill, it had no alternative but to deny the entire amount").

10.  Esteban's lost earnings caused by the accident total $38,880.23.

11.  Whether a plaintiff may recover medical damages in excess of the amount accepted as full payment by the medical service provider is an unsettled question under California law that is currently pending review by the California Supreme Court. *See Howell v. Hamilton Meats & Provisions, Inc.*, 179 Cal. App. 4th 686, 706-07 (Cal. Ct. App. 2009) (rejecting *Hanif* rule) *withdrawn by, petition for review granted at* 106 Cal. Rptr. 770 (Cal. 2010).  However, a court may consider the amount billed for medical services in determining the reasonable value of such services notwithstanding the rule set forth in *Hanif*. *See, e.g.*, *Olsen v. Reid*, 164 Cal. App. 4th 200, 202 (Cal. Ct. App. 2008) (declining to reach Hanif/Nashihama issue and holding that consideration of amounts billed is appropriate in determining reasonable value of services); *Greer v. Buzgheia*, 141 Cal. App. 4th 1150, 1157 (Cal. Ct. App. 2006) (consideration of amounts

**15**

charged appropriate in determining reasonable value of medical services); *Katiuzhinsky,* 152 Cal. App. 4th at 1295 (same); *Chapman v. Mazda Motor of Am.*, 7 F. Supp. 2d 1123, 1124-25 (D. Montana 1998)(same).  Unless the finder of fact concludes that the reasonable value of medical services rendered to a plaintiff exceeds the amount that was actually paid for such services, the rule set forth in *Hanif* is not implicated.  *See Greer*, 141 Cal. App. 4th at 1157 (countenancing trial court's practice of "reserving the propriety of a Hanif/Nishihama reduction until after the verdict").

12.  The only evidence in the record evidencing the reasonable value of the past medical services provided to Plaintiffs consists of the amounts billed by the service providers and the amounts accepted by the service providers in full satisfaction of these medical charges.  In light of the fact that the service providers accepted reductions of the total billed amounts as full payment, belies a finding that the billed amounts represent the reasonable value of the services provided.  The best evidence of the reasonable value of the services received by Plaintiffs contained in the instant record is the evidence showing the payments accepted by the medical service providers in full satisfaction of Plaintiffs' medical debts, which proves the actual loss.  The recoverable medical costs to date that Esteban is entitled to recover is $74,864.83 in damages for past medical expenses, and that Leticia is entitled to $4,245.88 for past medical expenses.

**Esteban's Future Medical Expenses**

13. "Although it is desirable that there be definiteness of proof of the amount of damage as far as is reasonably possible, it is even more desirable that an injured person not be deprived of substantial compensation merely because he cannot prove with complete certainty the extent of harm he has suffered." *Garcia v. Duro Dyne Corp.*, 156 Cal. App. 4th 92 , 98-99 (Cal. Ct. App. 2007)(citation omitted). Where evidence establishes that future medical costs are reasonably certain to fall within a projected range, a finder of fact may award damages that do not exceed the upper limit of the range established by the evidence. *Id*. Nor is it reasonable to go below the range absent conflicting evidence.

14. Dr. Cash testified that Esteban will require knee replacement surgery within the next five to ten years, as well as ankle replacement surgery. Based on the estimates provided by Dr. Cash, the most reasonable amount is the midrange of $75,000 damages for his future knee replacement surgery and $47,500.00 the midrange in damages for his future ankle fusion surgery, for a total of $122,500.00 for future medical specials.[1] For total medical specials, past and future of $197,364.83 for medical specials plus lost wages of $38,880.23. This totals $236,166.06.

---

[1] Defendant contends that the reasonable value of future medical services Esteban will require will likely be less than Dr. Cash's estimates, because medical service providers often accept considerably less than the amount billed in full satisfaction of medical debts. Defendant asks the court to limit Esteban's future medical damages to $50,000.00. Defendant's contention is too speculative to accept, as the actual amount that will be accepted by a medical provider in the future depends a plethora of unknown variables.

**17**

**Esteban's Non-Economic Damages**

15. "California case law recognizes, as one component of general damage, physical impairment which limits the plaintiff's capacity to share in the amenities of life." *Loth v. Truck-A-Way Corp.*, 60 Cal. App. 4th 757, 764 (Cal. Ct. App. 1998) (citations omitted). California law does not provide a definite standard or method of calculation by which to fix reasonable compensation for physical impairment which limits a plaintiff's ability to engage in certain life activities. *Id*. However, California law requires the finder of fact to "impartially determine pain and suffering damages based upon evidence specific to the plaintiff." *Id*.

16. In light of the evidence adduced at trial concerning Esteban's pain, suffering, and the physical limitations Esteban will face for the remainder of his life, approximately 34 years, Esteban is entitled to $525,000.00 in non-economic damages for pain, suffering, and loss of consortium and quality of life. He will have experienced four (4) surgeries.

**Leticia's Loss of Consortium Damages**

17. California law grants either spouse the right to recover for loss of consortium caused by negligent injury to the other spouse. *E.g. Rodriguez v. Bethlehem Steel Corp.*, 12 Cal. 3d 382, 392-93 (Cal. 1974). In a common law action for loss of consortium, the plaintiff can recover not only for the loss of companionship and affection through the time of the trial but also for any future loss of companionship and affection that is

**18**

sufficiently certain to occur.  *Boeken v. Philip Morris USA, Inc.*, 48 Cal. 4th 788, 799 (Cal. 2010).  When a plaintiff's spouse is permanently disabled as a result of a defendant's wrongdoing, future loss of companionship and affection is sufficiently certain to permit an award of prospective damages.  *Id*. at 799-800.

18.   In light of the evidence adduced at trial concerning Esteban's pain, suffering, and the physical limitations he will face for the remainder of his life, Leticia is entitled to $30,000.00 in damages for loss of consortium, plus medical, economic damages of $4,245.88.

### **ORDER**

For the reasons stated, it is ORDERED that:

1) Defendant is liable to Esteban Quintero in the amount of $236,166.06 for economic damages and $525,000 for non-economic damages for a total of $761,166.06; and

2) Defendant is liable to Leticia Quintero in the amount of $30,000 for loss of consortium damages, plus $4,245.88 in economic damages;

3) Plaintiffs shall recover their costs of suit; and

4) Plaintiffs shall submit a form of judgment consistent with this Order within five (5) days of service of these findings.

IT IS SO ORDERED.

**Dated:   July 2, 2010**               **/s/ Oliver W. Wanger**
                                         UNITED STATES DISTRICT JUDGE